in his official capacity as Secretary, U.S. Department of Health and Human Services, et al. Mr. Frye for the appellant, Mr. Coppell for the appellees. Good morning, Mr. Frye, whenever you're ready. Good morning. May it please the Court, I'm Paul Frye, representing the Swinomish Indian Tribal Community.  The Supreme Court in the Rama Navajo Chapter case held that the Indian Self-Determination Act, quote, mandates that the Secretary shall pay the full amount of contract support costs incurred by tribes in performing their contracts, end quote. This case will determine if the Indian Health Service is required to reimburse the tribe for its CSC on all of the federal program that it compacted to perform, including its generation of so-called program income, that is, revenues from Medicare and Medicaid and third-party insurers. If the tribe's earning and collection of such program income is included in the compacted federal program, then the tribe should prevail under the plain language of Section 5325A3. I think there are three main points that I'd like to make this morning. First, the tribe's activities to generate program income are unquestionably part of the federal program that it compacted to perform, both in the compact and in the funding agreement. Second, Subsections 5325A2 and A3 entitled the tribe to the CSC on the entire federal program without regard to how well the tribe negotiated under Subsection A1. And third, the tribe's construction of the Act, we believe, is compelled by the plain language of A2 and A3 in 5325. But even if it's not, it's certainly a reasonable construction of the Act, and under this court's decision in the Muskogee case, any reasonable construction of the Act advanced by the tribe must be adopted. The funding agreement clearly requires us to both earn and collect program income. It requires us, it states all Medicare, Medicaid, and other program income earned by the tribe. We have to earn it, then we collect it. Earning that program income takes a lot of work and a lot of expense and a lot of overhead, the same expense and overhead that is incurred by the tribe in performing work for people who are not covered by Medicare, Medicaid, or other third-party insurance. Mr. Fry, let's assume that IHS is not running the medical services, that the tribe is running the services, that they have a contract with IHS, and let's assume also that it's possible for Medicare, Medicaid program income to be generated. What is the tribe's option for letting IHS collect that income? And if IHS collects it, what does IHS do with it? If IHS collects that income, it will eventually funnel that money to the tribe. It will return that money to the tribe. It should return 100% of the program income to the tribe. So this is not a rhetorical question. I really don't know the answer to this. Why not run the health services yourself as a tribe, get the secretarial amount, get the CSC based on the secretarial amount, but let IHS collect the Medicare, Medicaid program income, and then let IHS spend that on the tribe? Maybe you don't have any Medicare, Medicaid compliance costs yourself. Well, the reason is, I think there are several reasons. One is, as a practical matter, there's no accountability. What we found is that IHS will send us a check, but they won't necessarily send us the right amount of money. Secondly, there's a substantial delay in the IHS processing of these funds, and that actually harms the physical soundness of the tribe's program. I think those are the two main ones. Let me ask you a question. I'm going to ask the government as well. Hopefully, you're both on the same page, because this is just a fact question on me trying to figure out how this works. Let's say that we go back to a time when IHS was running all the health services. I'm just going to use really simple numbers here. IHS was receiving $1,000, and then it was spending $1,000 on the tribe. Then it was also receiving $200 from Medicare, Medicaid, program income, etc. Was it spending all $200 of that on the tribe, or was it spending part of that on the tribe and spending part of that on compliance costs that come with dealing with Medicare and Medicaid? My understanding of the law is that under the Indian Health Care Improvement Act, Section 1641C, IHS was required to spend program income on specific things. One, facilities, because the Indian health care facilities nationwide were dilapidated, and two, expanding and improving health care services. Now, what IHS was able to generate in order to cover its costs came from a separate fund called direct operations, and that's explained, I think, in great detail in the amici brief. IHS has a separate bucket of funds to cover its costs in generating that, which, if we don't get contract support costs, we are deprived of. That would violate both the Section 5325A1 requirement that we get at least as much as the secretary would have provided or spent in performing the program, and also the Indian Health Care Improvement Act at Section 1602 sub 7, which requires the same thing. I have one more question that's not related, but maybe I'll just ask it, and I'll get out of your way and out of my colleague's way. Section 5326 informs Section 5325, at least when we're dealing with Subchapter 1. The government, I think, wants us to say, well, when we're dealing with Subchapter 5, compact, like we have here, we are directed to 5325 in order to figure all this out. And then the government would say, as we read 5325, that is still informed by 5326, and I think you would say, no, that's wrong. 5326 doesn't matter at all when we're dealing with Subchapter 5 and compacts. Is that your position, and if so, what's your argument? Yes, the argument is that under Section 5396 only enumerated parts of Subchapter 1 apply to compacting tribes under Subchapter 5. But one of those enumerated parts is 5325, which is informed by 5326. We would say that that kind of backdoor application of 5326 would violate 5396 because we did not opt to include 5326 as some of the sections of Subchapter 1 in our funding agreement at Joint Appendix page 54. But can't any number of things inform 5325? The dictionary could inform it, history could inform it, and maybe 5326 can inform 5325. Well, our position is not that we are entitled to double dip, regardless of 5326. We're entitled to the same amount of money from the Secretary as the Secretary would have provided for the operation of this program. And it's absolutely clear that the Secretary uses a lot of money to generate program income and that the Secretary is reimbursed for IHS's overhead costs from a separate bucket. We simply want to substitute contract support costs to us, the tribe, for that separate bucket that allows the Secretary to comply with 1641 in his or her use of those funds and also to cover costs of generating the program income. If we're looking at the San Carlos decision, which certainly is the 5326 decision that's been pointed out by IHS, I think we satisfy whatever requirements that court would have imposed on us, assuming that 5326 does apply. The generation, the collection and earning of program income is certainly directly attributable to our contract. It's required by the Compact at Joint Appendix 40 and by the funding agreement, Joint Appendix 49. It's required by the payer of last resort provision in the Health Care Improvement Act, Section 1623. But your funding agreement doesn't specifically discuss including these costs as part of CSC or in the program costs, right? I mean, you're relying on your agreement to exclude 5326 and to say that this is contemplated, but there's a very detailed calculation of direct and indirect costs, and it doesn't include any of these costs. Even putting aside your statutory arguments, why aren't you barred from making this argument because of the agreement that the tribe signed? Well, and that seems to be the principal position of the government here. And the reason is the funding agreement itself does not set those calculations in stone. And I'm quoting now from page 52 of the Joint Appendix, to the extent it is consistent with the ISDEAA. That's the first caveat. The second one is because A3 says that we will be reimbursed for CSC incurred, that's backward looking. That's not something that you negotiate definitively at the outset. So the same page of the Joint Appendix says that our CSC may be adjusted based on tribal CSC need. That's the words there. That's the second caveat in the funding agreement. The third is the very final sentence in that same paragraph on JA52. Nothing in this provision shall be construed to waive any statutory claim that the compactor may assert it is entitled to under the Self-Determination Act. So we're relying on the operative provisions of the Self-Determination Act. We're not relying on stray words and alternative dictionary definitions. We're relying on the operative provisions of the Self-Determination Act that confirm our ability and our right to get contract support costs on the federal program that we've compacted to perform. I hope that wasn't too dogmatic, but the funding agreement itself, Your Honor, does set forth those three caveats with respect to what we negotiate at the outset of the year. Okay. Any questions from my colleagues? Okay. Thank you, Mr. Frey. Thank you. Mr. Cappell, please proceed when you're ready. Thank you, Your Honor. As I was trying to say at the beginning, it was nice to see you as well. May it please the Court, I'm John Cappell from the Department of Justice, representing the Appalachian Secretary. You're going to have to speak up. We can hear you, but it's faint. So please stay close to the phone and speak up. Okay. The plaintiff does not dispute that it's received all of the contract support costs that it was entitled to receive under the funding agreement and the compact. Now, the plaintiff is seeking additional contract support costs essentially that are abstract costs. The plaintiff is not seeking any specific additional costs. Instead, it is making an abstract legal argument that is entitled to further contract support costs, even though it has not shown any additional costs. When one looks at the way contract support costs are computed, which is determined not by the statute itself, but by the Indian Health Manual and the agreement of the parties, the calculation for contract support costs is based on the secretarial amount and direct costs, and then a percentage of that figure to compute indirect contract costs. Now, again, the plaintiff has not even attempted to show any additional direct costs. Instead, the plaintiff is saying that it's entitled to 5.065% of the additional figure that comes from the program income. But that is not the way the contract support costs are computed under the Indian Health Manual. And the statute does not override that in any respect. Can I ask, Mr. Capel, on the statute, one of the arguments is a very complicated scheme, but if I'm tracking it correctly, one of the arguments the tribe makes is that these costs fall within the secretarial amount. And one of the reasons they say that is that 5388C includes any funds that are specifically or functionally related to the provision of services and benefits to the Indian tribe. And that seems, functionally related to the provision of benefits, seems like a broad formulation. Well, Your Honor, again, we have addressed 5388C in our brief, but that is not the way the statute should properly be read as a whole. The statute draws the clear distinction between program funding or the secretarial amount and program income. And that comes from, first of all, from 5325A-1-3, which defines the secretarial amount and contract support costs, and 5325M and 5388J, which discuss program income. And the 5325A-1 itself defines the secretarial amount as the amount of funds provided under the terms of the self-determination contract. And it shall not be less than the appropriate secretary would have otherwise provided for the operation of the programs. So, in other words, that is the secretarial amount. It is a substantive amount, and it has nothing to do with program income. Program income, I feel, that is defined in 5325M, which says that it shall program income earned by the tribe, and, of course, it turns out that the contract shall be used by the tribe for the general purposes of the contract, and shall not be a basis for reducing the amount of funds that are otherwise obligated. In other words, you get the secretarial amount. And what this does, and 5388J is comparable to that. It sort of does the same thing, but it uses a slightly different language. It says that the program income is supplemental to the other program funding. I think you're right to the extent we're looking in the four corners of 5325. I'm just wondering if I'm, I'm just wondering why 5388C might not expand 5325, because it says amounts specified under 5325A1, which is the secretarial amount, and amounts for support costs, which are the CSCs. And then it has this including language, which seems to broaden, seems to broaden the scope of what the secretary is obligated to fund. Well, again, that doesn't, in our view, that does not override the definition of program funding or the secretarial amount, and the distinction between that and the program income. And again, it's also supported in 5326, which was previously discussed, and which does indeed apply to contracts by its very terms. And it says that the contract support costs may be extended only for costs directly attributable to contracts and contracts, which, again, is not that the program income is not directly attributable to it. Now, again, we don't believe that the functional, that the language in 5388C somehow overrides the provisions, all of these other provisions of the ISDA. And that, okay, so. Can I ask you a question, Mr. Cabell? Yes, you are. Under the statute, would it be possible for the tribe to contract with IHS to receive CSC for the program funds? Or would that be barred by the statute's limits on duplication or other restrictions that are in 5325? I mean, is it possible for them to contract for that as part of CSC? No, Your Honor. Again, we believe that they're getting all the CSC that they're entitled to under the statute and the contract by virtue of the existing arrangement. And, of course, they do get their program billing expenses. That is something that they have undertaken to the extent that they are seeking third-party costs. And they have assumed that responsibility, and they're getting reimbursed for that as part of the secretarial amount. So would the statute bar contracting for reimbursement of those fees? Would it prohibit? I understand you're saying it's not required by the statute. But would they be prohibited from contracting for that reimbursement? Well, yes, Your Honor. I believe that in that situation, the Indian Health Service would take the position that those are not proper costs and, therefore, it would decline the contract. Of course, here, the plaintiff has raised this kind of at the back end of the process. It's raised a contract claim for breach of contract for additional damages, which it is claiming are in the amount of this, as I said, abstract, unspecified contract support costs. And that is just not the way the statute works. And that's really the essence of the government's position. All right. Let me see if there's anything else that I wanted to cover. Let me jump in, if I can, as long as I'm not interrupting. Judge Rao, I'm not interrupting your line. Mr. Capel, let me ask two questions. And this one of them, unfortunately for me, at least, has a little bit of math. So I'm going to start with the other one. Doctors have compliance costs when they bill Medicaid. Back in the old days when IHS was running the services on tribal lands, IHS used to bill Medicaid. Did IHS have compliance costs back then when it billed Medicaid? I'm not sure. I don't believe so. I'm not entirely sure. When you're referring to compliance costs, what exactly does that entail? Well, as I understand it, the federal government sometimes requires audits. Sometimes they require more complex accounting than a contractor might otherwise do. I mean, in the case of the tribal health services right now that are contracting with IHS, we're told that their compliance costs are something like 30 percent of the money they actually receive from the contract. And I don't care whether 30 percent is right or 25 or 15. But there seems to be a recognition that when you're getting money from the federal government, the federal government imposes some requirements that cost you money, some compliance requirements. And I'm sure that every doctor in America who bills Medicaid has to satisfy some compliance requirements. And I'm sure that satisfying those compliance requirements costs them some time and money. And so I would imagine that IHS had compliance requirements back when it was running the services on the ground and when it was billing Medicaid and when it was receiving money from Medicaid. I don't really know how they couldn't have had some compliance costs that went with billing Medicaid. So my first question was, do you agree? And I'll ask you again. And if you don't know, you don't know. In our view, whatever compliance costs, whatever overhead and general costs they had would be factored in under Medicare and Medicaid. And that's the program manual, but the Medicare provider reimbursement manual and the state Medicaid reimbursement manual. Part of that money is providing for overhead and whatever costs are incurred that way. Okay. Mr. Capel, let me ask. I think that's right. That's what some of your briefing says about the fees that Medicaid and Medicare pay. They're based not just on the direct health services that are being provided, but they're also based on compliance costs. So here's my, again, at the risk of showing my lack of math skills, here's my math question. Back when IHS was running the services on tribal lands, let's say there was one year where, and I'm going to use really small, really simple numbers for my own sake here. Let's say there was one year where IHS billed Medicaid for $2,000. Okay. And Medicaid then writes them a check for $2,000. And there is an obligation on IHS to spend that money on that tribe. Now, here's my question. Let's say that complying with Medicaid costs about 30% of what you get from Medicaid. My guess is that IHS would have then spent $1,400 of that $2,000 on providing direct health services. And it would have spent $600 of that $2,000 on the compliance costs that come with having to deal with Medicaid and Medicare, which, to be frank, is not something I would wish on my worst enemy. If that's the case, if that's how it worked, then I think that the tribe is wrong here. I think they're getting, assuming all else is the same and constant, they're getting $2,000 the next year from Medicaid, and they should spend $1,400 of that on direct health services, and they should spend $600 of that on compliance costs. And to the extent they chose to spend all $2,000 of the $2,000 on direct health services, and they don't have the money, the extra $600 left to spend on the compliance costs. Well, they didn't do it the way they were supposed to do it. They spent too much. So I think you're right if that's how it all worked, but here's my question for you. Back in the old days when IHS was running the health services themselves, maybe it was the case that when IHS billed Medicaid for $2,000, IHS turned around and spent all $2,000 of that on direct health services. And if that's the way it used to be, then this new system does seem like it's worse off for the tribe. There's $600 less being spent on direct health services. And I suppose if this is the thing that had happened, if back in the old days Medicaid had spent all $2,000 on direct health services, I mean that extra $600 compliance costs had to come from somewhere. It's possible IHS just found that money somewhere else out of its treasury, out of its, you know, some other account and spent it. And if that's what was going on, my concern is that the tribe is worse off when it has made a choice to provide health services itself rather than letting IHS run the show. So I guess that was a really long question, but there's really one small part of it that I wonder if you could help me with. Back in the old days when IHS was providing health services itself and it billed Medicaid for $2,000, did it spend all of that on direct health services or did it spend part of that on direct health services and the rest of it on compliance costs? Well, Your Honor, I'm really, I'm not sure I really, I mean I can't answer that question sort of directly because I'm not exactly sure how, you know, how that worked. But I do know that under the statute now when IHS is running the program, it is obligated to pay, to use all of the funds that it gets from Medicare and Medicaid for the program, for program costs. But perhaps the main point is that if the tribe believes that it has, that it actually has other costs, that it has incurred specific costs as a result of receiving program income, certainly it is able to make a claim like that and make a showing with the IHS, but it has not done anything like that here. What it has done, what it's done is arguing that basically it is a purely theoretical matter based on its, in our view, incorrect understanding of the statute that they were entitled to additional CSC computed, you know, in accordance with a formula of their own creation that's based on the amount of program income they've received. It's not really, it's not tied to any specific costs. And that is what's, that's the crux of the problem with their position. And it's not, it's just not, this is not the way the statute works. And it's clear that the, in our view and in the view of three of the four, the four district courts that have addressed this issue, it is clear on the face of the statute that that's not the way it works. And so obviously, Can you just clear up? I heard you to say in that answer that if the tribe wanted to, it could at least try to negotiate for a claim to get the compliance costs that come with billing Medicaid. They didn't do it here, you say, but they could at least try that to do that negotiation if they could prove what they need to prove. But I thought you had told Judge Rao that they're not allowed to do that. Did I misunderstand one of those two answers? I'm not, I don't, I, what I'm saying that they're not allowed to do is give them a percentage of the program income without any showing of actual costs. Without any satisfaction of the criteria that the Indian Health Manual establishes for the, for direct and indirect costs, contract support costs. So that's, that is really, we're not saying that they can't, that they can't make a showing with respect to claims, additional, additional contract support, cost expenses, but they have to be concrete. They have to be, they have to be specific and they can't be based on the sort of, on this, really this abstract formulation or legal, legal construct that the, that the tribe has made here. Judge Rao? No. Judge Walker? Okay. Thank you, Mr. Capel. Thank you, Ron. Mr. Frey, we'll give you a few minutes. Thank you very much. I can answer Judge Walker's question. Back in the old days, IHS spent 100% of its program income on facilities. It was required to under a previous incarnation of the law. Now, under 1641C, IHS is required to spend 100% of its program income on either facilities or expanded healthcare, not overhead. So, your hypothetical, Judge Walker, I think is correct. We are getting less for our compacting efforts than the government would have received under the old regime. And where it got that money is from a separate bucket, the direct operations bucket, which is under, I think it's A2B. That's a separate bucket from which the IHS gains revenues and which we're entitled to. Now, I agree with Judge Katsas as well. Okay. Thank you. 5388C, the including phrase. Sorry, before you get there, just walk me through that once more. You said that IHS would have to spend all of the program income on providing healthcare as opposed to overhead? Yes. So, how would they, from what source would they get funding for the overhead and the compliance costs and things like that? That would come from other funds in the department, and specifically the direct operations budget item that funds these things. And that's, I think, the contribution of the amici on pages 21 and 22 of their brief. So, if that's sufficient, Judge. Yeah. Okay. So, the including phrase in Section 5388C does indeed expand the tribe's entitlement, and the agency that agrees with us on that is HHS. 42 CFR Section 137.79 construes that including language to be in addition. So, yes, we agree with the thought of Judge Katsas in that respect. And to try the including phrase refers to services and benefits, which strike me as a little bit different than earnings. Can you help me with that concern?  Well, C begins with the secretary shall provide funds, including contract support costs, including any funds that are specifically or functionally related to the provision of services. So, the funds are related to the provision of the services, and the provision of the services are the provision of medical services to people covered by Medicare, Medicaid, in my reading of that. To Judge Rao's question, the Indian Health Service will not even entertain negotiations on CSC being part of the A1 amount. It's off the table. And to the main point, I think, of my colleague, we agreed to an indirect cost rate of 31.91%. And Judge Rao, that's actually quite a bit less than even the percentage for HHS. There's a study that was done and reflected in a hearing in 1999, I believe, serial number 106-52. And the concern that was raised was, oh, the tribes are getting out of control with their indirect cost rates. It turns out they're roughly half of what the indirect cost rates are for federal agencies, state agencies, universities, and others. And that's on page 26 of that particular study. The 31.91% isn't just a lawyer's abstraction. It's an agreed-upon figure that the Office of Management and Budget recognizes is a necessary expedient. You can't go and nickel and dime different operations to find, you know, absolute specificity and precision to overhead costs. We don't, and IHS doesn't, have separate staff that provides services to people covered by Medicare and Medicaid. It's all within our organization. And we agreed that the 31.91% was the appropriate rate. And that extends throughout all of our program and all of our staff. And I note that this concern... You're over time, Mr. Fry. Judge Rao, any questions? Judge Walker? No. Okay. Thank you, counsel. Thank you. Submitted.
judges: Katsas, Rao, Walker